Minsky *v.* Keystone Wiper & Supply Company et al., Appellants.

Argued October 17, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Frank R. Ambler,* for appellants.

*David L. Ullman,* with him *Louis. Silverman* and *Isaac R. Hirsch,* for appellee.

OPINION BY CUNNINGHAM, J., December 11, 1940:

The theory upon which the claimant in this workmen's compensation case sought compensation for her-

self and four minor children by reason of the alleged accidental death of her husband, Anthony Minsky, on September 27, 1937, during the course of his employment with Keystone Wiper and Supply Company, was that a heart condition with which he was afflicted was so aggravated by a sudden and unusual effort and strain, occasioned by an unexpected, fortuitous incident, as to make his death, immediately following that happening, compensable under Section 301 of our Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §§ 411 and 431.

Among other duties of the decedent, forty-eight years of age, was the unloading of large bales of "wipe rags" (weighing from 800 to 850 pounds each) from trucks, in which they were brought to the warehouse of his employer. About eight o'clock on the morning of his death a truck, containing eight bales and driven by John Clayborne, had been backed up to the platform of the warehouse and decedent and a fellow employee, Harry Vinsky, were engaged in the work of unloading the delivered bales. The method employed was to bring a hand truck into the body of the large delivery truck, place a bale upon it, with the use of baling hooks, and wheel the small truck down a short, sloping runway to the platform of the warehouse, about six inches lower than the floor of the motor truck. Three bales had been unloaded in the usual way. While decedent was endeavoring to place a bale weighing 850 pounds, described by the driver as the largest he had ever delivered to the warehouse, "the hand truck kind of slipped" and the bale started to fall toward decedent, who, in order to prevent it from falling and, in the language of Clayborne, throwing "him out of [the] truck and on the platform," endeavored to "right" the bale and push it back on the hand truck. With the assistance of Vinsky and Clayborne, the bale was prevented from falling. Clayborne testified, "I gave him a lift with it and after he got it up he said he had a little pain right over his

chest, or heart, over his chest." Decedent wheeled the hand truck with the bale down the runway and along the warehouse platform, but after proceeding a distance of about twenty-five feet collapsed and died within two minutes after he had left the large truck.

The immediate cause of death, as disclosed by an autopsy, was "coronary occlusion with infarct—a closure of one of the arteries of his heart within an area of long degeneration of his heart muscles—due to a clotting in conjunction with coronary disease." Decedent's heart condition had existed for a considerable period of time prior to his sudden death. The unloading of the bales occurred on a Monday. On the previous Saturday he had consulted a physician—complaining of pains in his back and chest and of a "vague feeling around the pericardial region"; his blood pressure was low and "heart sounds not strong." The physician gave him medicine and advised him to stay in bed. Decedent's preexisting physical ailment was thus described by one of the heart specialists called by claimant: "Q. Doctor, what is a coronary occlusion with infarct—in lay terms? A. Coronary occlusion—by that we mean an obstruction of a vessel. In this particular case, I believe we are dealing with a coronary thrombosis which is that type of occlusion due to a blood clot in the vessel. As soon as a blood clot occurs in an artery, after a certain period of time—a matter of hours —certain changes occur in the heart muscle because it doesn't receive its ordinary normal supply of blood and those changes that are undergone in that muscle are practically analogous to actual rotting of the muscle, the maximum amount of damage, occurring during a certain actual time intervening after the occlusion of it, heals to a certain extent in a period of months, the period varying with the degree and the actual vessel occluded—the actual healing may occur in a period of months."

Upon the question whether decedent's ailment was a

necessarily fatal one, the same witness testified: "Q. Doctor, is coronary occlusion with infarct always fatal immediately? A. No, sir. Q. Will you tell us, how long can people live who have coronary occlusion with infarct? A. As long as nine or nineteen years. Cases have been recorded."

With relation to the same subject, another specialist's testimony reads: "Q. How long does it take for an infarct to develop? A. It depends entirely upon the infarct. If it is a very large infarct due to some foreign body it can develop very quickly, in an hour or two. If it is a small infarct it may take days. Q. Doctor, have you ever seen a case of coronary occlusion with infarct where the individual did not die of heart disease? A. Oh, yes, very many of them ...... Q. Doctor, assuming that Anthony Minsky had a coronary occlusion with infarct, would the inherent defect of a chronic condition render him more susceptible to [the effects of strain and stress] than an ordinary person would have been? A. Yes, sir, very much more."

We, therefore, have a case where the deceased employee had a preexisting chronic heart condition which, while serious, did not prevent him from carrying on his usual activities, but did render him more susceptible to the effects of any unusual strain or effort than an ordinary person would have been. While engaged in his usual work, something external, undesigned, sudden and unexpected, occurred outside of the usual course of events—the accidental slipping and falling toward him of the bale. The effort and exertion necessitated by this fortuitous happening were clearly unusual and extraordinary.

The controlling issue of the case, therefore, was whether the death of the employee was attributable to the normal development of his heart ailment, or to the unusual exertion put forth by him. Claimant had the burden of showing by substantial competent evidence that the death of her husband was caused by that un-

usual exertion rather than by the natural progress of his disease.

After a hearing and rehearing before the referee a disallowance of compensation was entered upon the ground that the "death was brought about by and was due to natural causes." Upon claimant's appeal to the board that tribunal, after a review of the evidence, set aside the controlling findings of fact and the conclusion of law of the referee and, in lieu thereof, substituted its own findings to the effect that decedent in order to prevent the bale from falling "was required to exert unusual effort and strain not ordinary or usual in his work." Its seventh finding of fact reads:

"7. From all the evidence in the case, we find as a fact that the unusual effort, exertion and strain on the part of decedent in righting the bale of rags, weighing approximately 850 pounds, aggravated his preexisting heart condition, bringing about his death."

From the award made by the board the employer and its insurance carrier appealed to the common pleas. Without, at that time, writing an opinion the court below dismissed their exceptions, affirmed the award, and entered judgment thereon after correcting a mathematical error. Subsequently an able and helpful opinion was filed by FENERTY, J., in support of the judgment.

Upon this appeal from that judgment the sole question of law involved is whether the record contains substantial competent evidence sustaining the findings and conclusion of law by the board to the effect that claimant met the burden of showing her husband's death was due to the unusual effort he was suddenly and unexpectedly required to exert.

On this question the medical testimony was conflicting. Dr. Martin P. Crane, the coroner's physician who conducted the autopsy, and Dr. George D. Geckeler, a heart specialist, expressed the opinion that it was "impossible to isolate one feature of exertion, such as used in righting a bale, from the other forms of exertion

[decedent] indulged in shortly before he died" and that his death was due to the normal progress of the disease with which he was afflicted. On the other hand, Doctors Phillip R. Trommer, Samuel Bellet and Joseph B. Wolffe, (the two latter being heart specialists) definitely expressed their positive professional opinions that the death was caused by the exertion put forth when the bale slipped. Dr. Trommer, in reply to the question, "Would you say that the exciting cause of his death was the stress or strain shifting that bale?" answered, "Under the circumstances in which the accident occurred, I would say it was." Dr. Bellet's answer to the same question was, "I can say positively the added strain was the cause of the death." Dr. Wolffe thus expressed his opinion: "The exciting cause of death was sudden strain on an injured heart muscle by the falling or by this unusual strain that he had to do in protecting it or lifting this eight hundred and fifty pound load."

It was the function of the board to determine which medical opinion it would adopt; we find ample substantial and competent evidence upon the record supporting its above quoted seventh finding of fact.

In our opinion, this case clearly falls within the third classification of cases collected and reviewed in *Crispin v. Leedom and Worrall Company,* 142 Pa. Superior Ct. 1, 15 A. 2d 549, i. e., "those in which a weakened organ collapses by reason of some strain upon it, or a preexisting chronic condition is so aggravated that death or disability ensues, but the strain or aggravation is attributable to some external, unexpected, fortuitous and untoward, occurrence, aside from the usual course of events." Further discussion of the cases there cited is unnecessary.

Judgment affirmed.